## Case No. 15,463.

UNITED STATES ex rel. ROBERTS v. JAILER.

[2 Abb. (N. S.) 265.] [1]

Circuit Court, D. Kentucky. Oct. Term, 1867.

HABEAS CORPUS—POWERS OF DEPUTY MARSHAL—ARREST—HOMICIDE.

1. Where the return to a writ of habeas corpus showed that the petitioner was held in custody under a commitment regular on its face, and made by a competent court, for an act charged as an offense against the state law, but the petitioner alleged that he was really held for an act done under authority of the United States, the court, in view of the case involving a question between the state and the national government, adjourned the hearing and required the petitioner's counsel to give notice of the adjourned day to the state district-attorney for the county.

2. *Reasons recommending this practice,*—explained.

3. Upon a habeas corpus issued under section 7 of the act of March 2, 1833 (4 Stat. 634),

[1] [Reported by Benjamin Vaughan Abbott, Esq.. and here reprinted by permission.]

whether the petitioner, is held under state or federal process is immaterial. If he is confined "for an act done in pursuance of the law of the United States or of a process of any judge or court thereof," he is entitled to a discharge.

[Cited in Ex parte Thompson, Case No. 13.-934; Re Bull, Id. 2,119; U. S. v. McClay, Id. 15,660; State of Georgia v. Bolton, 11 Fed. 218; Re Neagle, 39 Fed. 850, 135 U. S. 74, 10 Sup. Ct. 672.]

4. A United States marshal has power to appoint a special bailiff to execute a particular process. So *held*, where the appointment in question was made within a state, the laws of which conferred that power upon sheriffs.

[Cited in Re Crittenden, Case No. 3,393; The E. W. Gorgas, Id. 4,585.]

5. The duty and proper mode of proceeding, by a marshal or sheriff, or deputy of either, in making an arrest under a warrant,—explained.

6. The rule is now settled that the habeas corpus act of March 2, 1833, gives relief to one in state custody. not only when he is held under a law of the state which seeks expressly to punish him for executing a law or process of the United States, but also, when he is in such custody under a general law of the state which applies to all persons equally, where it appears he is justified for the act done because it was done in pursuance of a law of the United States.

[Cited in U. S. v. McClay, Case No. 15,660.]

7. Where an officer, lawfully engaged in the attempt to execute process commanding an arrest, is resisted by the party to be arrested, in such manner that he is obliged to take the life of the latter in self-defense, he is justified by his process in so doing.

[Cited in U. S. v. Fullhart, 47 Fed. 805.]

[Cited in State v. McNally, 87 Mo. 658.]

Hearing upon a writ of habeas corpus.

Benjamin H. Bristow, U. S. Atty., for petitioner.

L. H. Noble, opposed.

BALLARD, District Judge. Upon November 9 last, a petition was presented to this court on behalf of James Roberts, setting forth, in substance, that he was confined in the jail of Fayette county, for some alleged offense against the laws of the state of Kentucky, but in fact, for an act done in pursuance of a law of the United States, and of a process of a judge thereof, and praying for a writ of habeas corpus, to be directed to the jailer of Fayette county. The writ was issued, returnable forthwith. Within a reasonable time after the service of the writ, the jailer of Fayette county produced in court the prisoner, together with his return, in which he stated, in substance, that he held the prisoner by virtue of an order of commitment made by the Mercer circuit court.

On behalf of the prisoner, it was conceded that this commitment to prison was entirely regular on its face; that the order of commitment was made by a court of competent jurisdiction, and on account of an alleged offense against the laws of Kentucky; but it was insisted, and offered to be proven in his behalf, that though he was imprisoned for an alleged offense against the state of Kentucky, his imprisonment was really for

an act done under the authority of the United States.

Although all the parties were before the court which the writ and the form of proceedings contemplated, and although it appeared that the prisoner was probably entitled to his discharge, I did not think it proper, in view of the importance of the case —involving. as it does, the grave question of a conflict of jurisdiction between the state and national courts—to make a final disposition of it. I therefore continued the further hearing of the case until November 30, and required the district-attorney, who appeared for the petitioner, to give written notice of the time, place, and nature of such hearing to the commonwealth's attorney for the county of Mercer, that being the county in which the offense with which the prisoner is charged is alleged to have been committed.

I do not find that this practice has been adopted in like cases in any other court of the United States. In all the cases which I have examined, the court has proceeded to a final hearing and decision on the return of the writ, without notice to any state officer other than the person to whom the writ was directed. I cannot but think, however, that the practice which this court has here adopted is better adapted to guard against abuse of the federal process, and to secure that full and impartial hearing which is essential to the due administration of justice. It is certainly a delicate matter for this court, although acting within the undoubted scope of its jurisdiction, to take from a state officer a person committed to him by a state court, charged with an offense against state laws. The great respect I have for state authority, the appreciation I have of the importance of a faithful enforcement of the criminal laws of the state, and the reluctance I feel to exercise any authority which may interfere with the regular administration of justice by the courts of the state, have induced me to adopt a practice, which, whilst it substantially protects the liberty of the citizen, in case he shows himself entitled to such protection. at the same time manifests no undue disposition to interfere with state authority, and tends to secure that full hearing which I think should, if possible, always be had when the question to be decided relates to a conflict of jurisdiction between the national and state courts. I have no disposition to shrink from the performance of any duty enjoined on me by the constitution and laws of the United States; but I will not and cannot interfere with the administration of the state laws. except when my duty is plain and my path clear.

On the day designated in the order, the learned attorney for the commonwealth in the fifth circuit, which includes the county of Mercer, appeared. and both he and the prisoner produced evidence.

By the attorney for the commonwealth it was shown, that on November 6, 1867, a

warrant, purporting to be founded on the oath of N. C. Cull, was issued by the presiding judge of Mercer county, for the arrest of the relator, charging him with the crime of murder; that on November 7, the same judge committed the relator to the jail of Mercer county, there to be safely kept until the 9th, when he was to be delivered to the sheriff, to be brought before him for examination; that on November 8, the relator was, by order of the circuit court for Mercer, transferred to the jail of Fayette county, the jail of Mercer county being ascertained to be insecure; that before this order of transfer was made, the grand jury impanneled in the circuit court for Mercer county had investigated the charge against the prisoner, and had agreed to return an indictment; and that they did, on November 14, return into court an indictment charging him with the crime of murdering one J. J. Cull.

On behalf of the prisoner, it was shown, that on October 16, 1867, a process, purporting to be founded on information given under oath, was issued by a commissioner of the United States, commanding the arrest of Joshua J. Cull, charging him with certain crimes under the internal revenue laws; that the process was immediately placed in the hands of a deputy marshal, who failed to execute it because he could not find the accused, though he visited his residence and made diligent search for him; that the process was then placed in the hands of another deputy, who likewise failed to execute it, though he also made diligent effort; that this deputy reported to the marshal that, in his opinion, the process could not be executed without the observance of unusual effort and secrecy, and that he had been credibly informed by the wife of the accused, and perhaps others, that the accused would forcibly resist its execution; that the marshal, on October 30, by writing on the back of the warrant, appointed A. W. Fogle special bailiff, and placed said warrant in his hands for execution, informing him at the same time of the necessity of observing proper secrecy, as the accused was endeavoring to evade arrest, and enjoined him to take with him assistance, as the accused would, if found, probably resist arrest.

It was also shown, that Cull knew the marshal of the United States had a process for his arrest; that on November 4, the deputy required the relator to assist him in the execution of said process; that in the evening of the same day the two proceeded to the residence of Cull, arriving there about eleven o'clock at night; that the deputy, Fogle, sent the relator to the back door of the house and went himself to the front door; that this precaution was adopted to prevent the escape of the accused; that the deputy knocked loudly at the front door several times before he received any response; that in reply to inquiries from within, "Who in the hell's

there?"—"What in the hell do you want?" he said, "Mr. Cull, I want to see you; I have business with you;" that in reply to the further inquiry, "Who are you?" he said he was an officer, and must and would see him; that after a few moments of silence, which the deputy understood Cull was employing in the preparation to open the door, he heard a noise at the back door, and his assistant, the relator, crying loudly, "Don't shoot! don't shoot!" that he immediately ran to the corner of the house, and saw Roberts coming toward him still crying "Don't shoot! don't shoot!" that Cull was advancing on Roberts, and fired twice in close succession at him near the back door; that Roberts continued to retire and Cull to advance; and that Cull, after having advanced fifteen or twenty steps from the back door, and after Roberts had retreated so as to be near the bailiff, again fired twice, but whether at Roberts or the deputy does not appear; that Roberts fired instantly at Cull once, and he and the deputy then retired and returned to Harrodsburg, a distance of ten miles, by separate roads, and that the deputy did not know till next morning that Cull was killed, or that Roberts was not killed. It appears from other evidence that this shot by Roberts proved fatal; that Cull was killed, and that when his body was found he held in his right hand, clenched tightly, a pistol, commonly known as a "revolver," of which four barrels were empty, and two loaded.

I attach no importance to the testimony of Mrs. Cull, who says she did not hear the person who knocked at the front door say he was an officer; nor to the testimony of Mrs. Funk, who says she was standing in her front door, about seventy-five yards from Cull's, and that she did not hear the remark; because the former was too much frightened at the time, and immediately afterwards, to remember what occurred, and the latter was too far off to hear what was said. This lady, however, did hear a voice which was not familiar to her, crying "Don't shoot! don't shoot!" She also heard what she took to be one shot near Cull's back door, and she saw two shots fired as the parties approached the front of the house, which she thought proceeded from the parties nearest the front.

I have stated thus minutely all the material facts proven, in order that the basis of my opinion and decision may fully appear. It is hardly necessary to say, that the writ issued in this case was not issued under section 14 of the judiciary act of 1789 (1 Stat. 81). This statute authorizes the judges of the United States to issue writs of habeas corpus only in behalf of persons who "are in custody under or by color of authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." To a writ issued under this statute, unless it issue simply to bring the party into court to testify, a return, showing that he is held under state

authority to answer to an offense against state laws, would be conclusive, and would oust this court of all authority to proceed further. The writ was here issued under and by virtue of the authority conferred by section 7 of the act of March 2, 1833 (4 Stat. 634).

This section provides "that either of the justices of the supreme court, or a judge of any district court of the United States, in addition to the authority already conferred by law, shall have power to grant writs of habeas corpus in all cases of a prisoner or prisoners in jail or confinement, where he or they shall be committed or confined, on or by any authority or law, for any act done or omitted to be done in pursuance of a law of the United States, or any order, process, or decree of any judge or court thereof, anything in any act of congress to the contrary notwithstanding." It matters not that the person is in confinement under the authority of a state, or of a law of the state. If he is confined "for an act done in pursuance of a law of the United States, or of a process of any judge or court thereof," he is entitled, under this statute, to his writ of habeas corpus, and to his discharge.

But the learned attorney for the commonwealth, frankly admitting that he is surprised at the extent to which he finds, on examination, the courts of the United States have exercised their authority under this act, still insists that the relator, in this instance, should not be discharged, because:—

First. He questions whether there was any authority in the marshal of the United States to appoint a bailiff; and he maintains that, if there was not such authority, there would be no pretense for the assertion that the relator was imprisoned for an act done in pursuance of a law of the United States, or of a process of a judge or court of the same.

I say the learned attorney only questioned the authority of the marshal to appoint a bailiff. He did not seem to have much confidence in the force of the objection, nor did he very earnestly insist upon it. In my opinion, there is not the slightest ground to doubt that the marshal does possess this authority.

The authority to appoint a special bailiff to execute a particular process, is recognized by all the authorities as appertaining to the sheriff. Wat. Sher. 35; Toml. Law Dict. tit. "Bailiff"; Hunt v. Burrel, 5 Johns. 137; Sergeant of Court of Appeals v. George, 5 Litt. [Ky.] 199.

There are several acts of congress which expressly recognize this authority as belonging to the marshal It has been exercised by the marshal of this district without question, as far as I know, since the establishment of the court; and such, I understand, is the common practice throughout the United States. Conk. Pr. 338 But what is entirely conclusive of the question, section 7 of the act of congress approved July 29, 1861 (12 Stat. 282), provides, "that the marshals of the several districts of the United States . . . shall have the same powers, in executing the laws of the United States, as sheriffs . . . in the several states have by law in executing the laws of the respective states"; and the laws of this state expressly provide, that "a sheriff may, by writing, empower any person to execute an original or mesne process." 2 Rev. St. 340.

The learned attorney insists, secondly— that the bailiff did not, in this case, proceed properly; that he ought to have informed Cull that he had a warrant for his arrest; and that, as Cull was not so informed, he had the right to attack and drive off the bailiff and his assistant, and they are not justified for resisting him.

I have already said, that Cull knew there was a process in the hands of the marshal for his arrest; and I think he had reasonable ground to believe, and did believe, when the person that knocked at the front door announced that he was an officer, and wanted to see him on business, that this person had process for his arrest. The witness, Mrs. Funk, says, that when the buggy, with two gentlemen in it, passed her door, she immediately suspected, from the unusual hour of the night, that they were officers, who had come to arrest Mr. Cull; that she therefore remained at her door watching the buggy till it stopped near Cull's house; and then, her suspicions being confirmed, she remained at the door until after the shooting, as hereinbefore detailed.

Ordinarily, "it is the duty of one seeking to arrest another, to make his purpose known, unless, what will probably answer instead of any express announcement, the circumstances are such as to render the purpose obvious." 1 Bish. Cr. Proc. § 615; Rex v. Davis, 7 Car. & P. 785.

Indeed, it has been expressly laid down, even in respect to an arrest by a private person without warrant, that where the circumstances are such as to make the intention to apprehend plain to the mind of him who is to be apprehended, he need not be told this, and the arrest will be legal, and the resistance of the arrested person illegal, the same as if the purpose had been in words announced. 1 Bish. Cr. Proc. § 615; citing Rex v. Howarth, 1 Moody, 207; Rex v. Payne, Id. 378; Pew's Case, Cro. Car. 183, 537, 538; 9 Coke, 65 b. The foregoing relates particularly to the duty of a person about to make an arrest when in the actual, visible presence of the party to be apprehended; but when not in this position, the authorities state, "it is his duty to proceed with secrecy to find him out, and actually arrest the party, not only in order to secure him, but also to subject him and all other persons to the consequences of escape or rescue." Chit. Cr. Law. 47, 48; 1 Bish. Cr. Proc. § 663. The bailiff, then, according to these authorities, proceeded with entire regularity. It was the duty of Cull to respond to the

knock at the door by opening it, especially when informed that the person knocking was an officer. If he then did not recognize the person as an officer, he had a right, if the person either arrested or announced that he would arrest him, to demand his warrant.

I suppose, that in all cases where an arrest is made by virtue of a warrant, the warrant being demanded, should be produced, but it is to be considered that the arrest, the explanations, and the reading of the warrant, when demanded, "are obviously successive steps. They cannot all occur at the same instant of time." In the case of a known officer the explanation must follow the arrest, and the exhibition and perusal of the warrant must come after the authority of the officer has been acknowledged and his power over his prisoner acquiesced in. Com. v. Cooley, 6 Gray, 350, 356, 357; State v. Townsend, 5 Har. [Del.] 487, 488; Arnold v. Steeves, 10 Wend. 514.

If the officer is not known as such, he should show his authority or warrant before making the arrest. Here it is probable that Cull knew, or had good reason to believe, the person knocking at his door was an officer having a warrant for his arrest; but whether he did or not, that person really had such warrant, and Cull, so far from demanding it, gave him no opportunity to show or read it, but endeavored to escape by his back door, and there making, immediately, without asking any explanation, a violent, and what was intended to be a deadly assault on the assistant of the bailiff stationed there. If Cull had accomplished his purpose, if he had killed Roberts, there is no doubt he would have been guilty of murder, for, though he, perhaps, did not know Roberts, or that he was an officer, he was in fact one, or in the attitude of one, and the law furnished Cull not the slightest excuse for deliberately arming himself and commencing a deadly assault without demanding any explanation.

The learned attorney for the commonwealth suggests, that, in the present disordered condition of things, in that portion of this state in which Cull resided, Cull had a right to suppose that Fogle and his assistant were robbers, "regulators," or "jayhawkers," and not officers; and therefore he might be excused for firing upon them without demanding any explanation. But, wretched as I have reason to believe is the state of society in certain portions of this state, insecure as I know both life and property are, I am not willing to admit that our condition is so bad, or that we have so far degenerated into a state of barbarism, that any court or jury will hold that one may lawfully kill another person, who simply knocks at his door in the night and announces that he is an officer and wishes to see him, and that too, without asking any explanation. I say I cannot admit this, but whatever juries might do in the case supposed, under their unlimited power to acquit, sitting here as a judge, sworn to expound the law as I find it in the authorities, I confess myself astonished to hear it gravely contended, that a homicide, committed under the circumstances supposed, so far from shocking all mankind and meeting with speedy punishment, should be palliated and even excused.

Upon the whole, my conclusion is that the bailiff and his assistant, up to the time of the attack of Cull on them, proceeded with entire regularity, and that there is nothing in the case furnishing the least excuse or palliation for the conduct of Cull.

Thirdly, and lastly. It is insisted that under the true construction of the act of March 2, 1833, the federal court can, under a writ of habeas corpus, relieve a party only when it appears that he is in custody under a state law which expressly seeks to punish him for doing what a law or process of the United States requires him to do. That, here, the state law does not make it criminal to execute the process of the United States or to enforce their revenue laws, but simply seeks to punish murder, no matter by whom committed; that the killing was done in this state; that the offense can be inquired of only in the state tribunals; that this court has no jurisdiction to try the accused; that under the construction of the facts most favorable to the relator he acted in self-defense, but that this is a matter which this court cannot pass upon, and which cannot be lawfully passed upon except by a jury of the vicinage.

I think there is great plausibility and even force in every branch of this proposition. True, much of its force is due to the ingenious form of its statement; but stripping it of this, and getting at the matter really contained in it, I think it still presents questions which I should find difficulty in answering if I had no aid from judicial decisions. I am, therefore, grateful that neither the question of the construction of the act of 1833, nor its application to cases similar to the present one, is now, for the first time, raised in a court of the United States.

By a long course of judicial decisions it may now be considered as settled, that this act gives relief to one in state custody, not only when he is held under a law of the state which seeks expressly to punish him for executing a law or process of the United States, but also when he is in such custody under a general law of the state which applies to all persons equally, where it appears he is justified for the act done, because it was "done in pursuance of a law of the United States, or of a process of a court or judge of the same." Ex parte Jenkins [Case No. 7,259], before Mr. Justice Grier; Ex parte Jenkins [unreported], before Judge Kane; U. S. v. Morris [Id. 15,811]; Ex parte Robinson [Id. 11,935], before Mr. Justice McLean; Ex parte Marshal [unreported]; Ex parte Trotter [unreported], decided by this court in 1862. The decisions in the courts of the United States are absolutely uniform on

this subject, and I find no opposing opinion of any court except a single one rendered by the supreme court of Pennsylvania—Thomas v. Crossin [5 Clark, 328]. But, surely, it cannot be expected that I should attach much importance to, much less follow, a single decision of a state court, opposed, as it is, to numerous decisions in the courts of the United States, some of them rendered by justices of the supreme court.

In the first Case of Jenkins and others, it appears, that Jenkins had in his hands a warrant for the arrest of a "fugitive from labor" named Thomas, issued under the act of 1850, and that when he and his assistant endeavored to arrest the fugitive they were resisted and had a violent and bloody encounter. A warrant was regularly issued by a justice of the peace of the state of Pennsylvania for their arrest, on the charge of "an assault and battery with intent to kill." Under this state process they were arrested and put in jail. But they were discharged by Mr. Justice Grier, by virtue of a writ of habeas corpus, issued under the act of 1833, the judge holding that the deputy Jenkins and his assistant having done no more than they were justified in doing by the warrant, they were imprisoned for an act done in pursuance of a law of the United States within the meaning of the act of 1833, and entitled to their discharge, though they were in state custody for an alleged offense against the general laws of the state, passed to punish assaults generally, and not at all to restrict or oppose the enforcement of the laws of the United States.

In the second case it appears they were imprisoned by virtue of a capias sued out in a civil action, brought in the supreme court of Pennsylvania, by Thomas, complaining of the said assault. From this imprisonment they were discharged by Judge Kane, upon the same ground taken in the first case by Judge Grier.

After this, they were indicted in Luzerne county, Pennsylvania, "for riot, assault and battery, and assault with intent to kill," and were arrested and imprisoned under a bench warrant, founded on the indictment; but they were discharged under a writ of habeas corpus, issued upon the order of Judge Kane, and heard before him.

I think it is impossible to distinguish in principle these cases from the one now before me. If Mr. Justice Grier and Judge Kane had jurisdiction of the cases severally before them, surely I have jurisdiction in the present case. If Roberts was not in terms directed by the process under which he acted to kill Cull, neither was Jenkins directed by his warrant to beat or wound Thomas. If Roberts was in state custody under a warrant issued by a state judge, for an alleged offense against the state laws, so was Jenkins when he was discharged by Judge Grier. Nay, more, when the second and third discharges of Jenkins took place, he was in cus-

tody under process issued out of a state court, the one founded on a civil complaint, and the other on an indictment for crime; but when the writ was issued in this case, Roberts had not been indicted, he had only been committed by a county judge to await an examination. True, the warrant under which Jenkins acted was issued for an alleged "fugitive from labor," under the fugitive slave act of 1850, and the warrant under which Roberts acted was for an alleged criminal offense, under the revenue laws of 1866 and 1867. But I suppose no one will assert that the rights of masters to their slaves are higher than the rights of the government to its revenue; or that the person of an officer when seeking to arrest a fugitive slave is more sacred than when endeavoring to arrest a criminal.

I disclaim all right and power to discharge the relator on any such ground as that the proof shows he acted in self-defense.

A jury would probably acquit him on such ground, independent of the process under which he acted; but I have nothing to do with such an inquiry. It belongs only to the state court. I have only to inquire whether what he did was done in pursuance of a law and process of the United States, and so justified, not excused, by that law and process. If the relator is to be discharged by me, it is not because he is excusable, upon general principles of law, for taking the life of his assailant when it was necessary to save his own, but because he was authorized, and is justified by the law and process under which he acted, to do all that he did. If he was not authorized, and is not justified by that law and process in all that he did, he is not imprisoned "for an act done in pursuance of a law of the United States, or of the process of a court or judge of the same;" and I cannot discharge him, but must remand him. I can discharge only the officer who relies on the law and process of the United States as his sole authority and complete justification.

The question then arises, was the prisoner justified in killing Cull, by the law and process under which he acted? He was certainly acting under a lawful process, which (though it did not expressly command the killing of the deceased), did command his arrest; and the authorities are uniform in effect that if one, in executing such a process, is resisted, and is obliged to take life, as in self-defense, he will be justified.

Bishop says: "In misdemeanors and breaches of the peace, as well as in cases of felony, if the officer meet with resistance, and the offender is killed in the struggle, the killing will be justified." 2 Bish. Cr. Law (3d Ed.) § 633. Even in civil cases, "if resistance be made, the person having authority to arrest or retake may repel force with force, and need not give back; and if death unavoidably ensue in the struggle, he will be justified." Id. § 664.

Mr. East says: "It may be premised, gen-

erally, that when persons having authority to arrest, . . . . . and using the proper means for that purpose, are resisted in so doing, and the party resisting killed in the struggle, such homicide is justifiable." 1 East, P. C. 295.

Wharton says: "Homicide in self-defense, or se defendo. . . is . . excusable rather than justifiable." 1 Whart. Cr. Law, § 135. "It is justifiable, not only when the proper officer executes a criminal in strict conformity with his sentence. but also when the officer, in the legal exercise of a particular duty, kills a person who resists, or prevents him from executing it." Id. §§ 936. 937. Officers of the law, when engaged in the performance of their duties, are invested with a peculiar prerogative. If resisted when so employed, and the party resisting be killed in the struggle, such homicide is justifiable. And on the other hand, if the party having such authority, and exercising it properly, happen to be killed. it will be murder, in all who take part in such resistance, though there be no malice. Id. § 1030. See. also, Bish. Cr. Proc. § 615; Fost. Crown Law, 273–308; Hale, P. C. 457. Other authorities might also be cited, but it is not necessary, since, as I have already stated. they are absolutely uniform.

Now, the facts proven do incontestably show, that the relator was lawfully endeavoring to arrest Cull (for it is hardly necessary to say that he stands in the same attitude with the bailiff himself); that he was proceeding properly; that Cull not only suddenly set upon and violently resisted him, but actually endeavored to kill him; that he forbore to exercise his full, lawful right of immediately pressing forward and killing his assailant, if necessary, but retreated, imploring the assailant not to shoot; that the assailant continued to press forward, and he to retreat; and that not until he had been fired at four times. and his life was in instant peril, did he fire and kill his assailant. No one will be so hardy as to deny, in the light of the authorities cited, that the facts furnished a full justification for the homicide. The justification rests not on the mere fact that the relator's life was in peril, but on the law and process under which he was acting, and on which he is obliged to rely to make out his justification. But if the process justified. that is, authorized the homicide, then it is clear the relator is imprisoned for an act done in pursuance of a law of the United States, or of a process of a court or judge of the same, and must be discharged.

It is accordingly ordered, that the prisoner be discharged. I have not been induced to arrive at this conclusion by any apprehension that the relator would not, if remanded, have a fair trial for his alleged offense, in the county of Mercer. I have profound respect for the learning and integrity of the judge who presides in that circuit. and the argument and bearing of the able attorney for the commonwealth. before me. are sufficient assurance of his fairness and honor. If I myself were

to be arraigned for any alleged offense, I know of no tribunal before which I could be tried with fuller assurance that enlightened and exact justice would be done me than in that in which these gentlemen are the chief officials. I discharge the relator from no apprehension that injustice would be done him by a trial in the state court, but because he has a right to demand his discharge at my hands under the laws of the United States, which I am bound to administer.

To avoid misapprehension, I desire to say that this court claims no general supervisory jurisdiction over state courts, nor any general power to interfere with persons or property in their custody; except in a few cases, where the constitution and acts of congress have given such jurisdiction and power to the courts of the Union. Ordinarily, the federal courts have no more authority to interfere with persons or property in custody under a process from a state court, than the state courts have to interfere with persons or property in custody under a process from a federal court. The federal and state courts have, in many cases, a concurrent jurisdiction over the same persons and things, and the rule is almost universal, that the officer who first gets possession under process from his court. has the preference. Therefore, the general rule is, that if a person be imprisoned under a criminal or civil process of one, the other cannot take him from such custody for any purpose whatever. It is only in virtue of the act of March 2, 1833, supra, that I have the right to interfere in this case. This act expressly empowers federal courts and judges "to grant writs of habeas corpus in all cases of a prisoner . . in confinement where he . . shall be confined on or by any authority or law for any act done . . in pursuance of a law of the United States, or any . . process of any judge or court of the same." And this act, by the express provision of the constitution of the United States, is the "supreme law of the land . . anything in the constitution or laws of any state to the contrary notwithstanding."

Petitioner discharged.